IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED
JUL 15 2010
CLERK, U S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

BP PRODUCTS NORTH AMERICA, INC., )
                                 )
         Plaintiff,              )
                                 )
v.                               )    1:09cv1147 (LMB/TRJ)
                                 )
CHARLES V. STANLEY, JR., et al,  )
                                 )
         Defendants.             )

MEMORANDUM OPINION

BP Products North America, Inc. ("BP") has sued Charles V. Stanley, Jr. ("Stanley") and his business, Telegraph Petroleum Properties, LLC ("Telegraph"), seeking an injunction to enforce a restrictive covenant in a special warranty deed. Before the Court are the parties' cross-motions for summary judgment. For the reasons discussed below, the defendants' motion will be granted and the plaintiff's motion will be denied.

I. FACTUAL BACKGROUND

BP is a corporation in the business of selling fuel and other petroleum products under the BP, Amoco, and Arco brands for consumption by the public. Defendant Stanley formed defendant Telegraph to operate an Amoco-branded gasoline station in Alexandria, Virginia. Before 2001, BP sold fuel directly to lessees and station-owner retailers, such as the defendants, who in turn sold the fuel to consumers. In 2001, BP changed its distribution model and began selling its petroleum products exclusively through independent wholesale suppliers, known as

"jobbers." These jobbers purchased the product from BP and then sold it to retailers such as the defendants. Eastern Petroleum ("Eastern") purchased the rights to be BP's exclusive jobber in Virginia.

As part of the transition to the jobber model, BP sold all the retail properties that it owned, offering its lessees a right of first refusal. Stanley was one such lessee who agreed to purchase the station property. On September 2, 2005, Stanley, through his LLC, Telegraph, entered into a Purchase Sale Agreement ("PSA") with BP to acquire the station property.[1] Attached to the PSA was a Special Warranty Deed which contained restrictions on the use of the property and also limited the operations that could occur on the property. Specifically, the Special Warranty Deed states, in relevant part:

> No part of the Property shall be used by Grantee or any other Grantee Party, directly or indirectly, for an automobile service station, petroleum station, gasoline station, or for the purpose of conducting or carrying on the business of selling, offering for sale, storage, handling, distributing or dealing in petroleum, gasoline, motor vehicle fuel, diesel fuel, kerosene, benzol, naphtha, greases, lubricating oils, or any fuel used for internal combustion engines, or lubricants in any form, or other petroleum or petroleum-related products, except for the personal use or consumption of such products by Grantee or its lessees of the Property unless any such use is in connection with the operation of the Property as a Grantor branded service station. For purposes hereof, "Grantor branded service station" shall mean a service station under

---

[1] BP has represented to the Court that Eastern had agreed to purchase the station property at the offered price had Stanley rejected the offer.

2

the brand BP, Amoco, Arco, or any other brand of the Grantor
or any of its affiliates or their respective successors and
assigns.

The above covenants and use restrictions bind and restrict
the Property as covenants and restrictions running with the
land and each portion thereof, and are deemed to benefit
Grantor as a user of, operator of, or supplier of Grantor
branded fuels to lands or retail operations in the County in
which the Property is located. These restrictive covenants
will remain in full force and effect for a term of fifteen
(15) years from the date of this conveyance whereupon these
restrictive covenants will automatically lapse and terminate
and be of no further force or effect.

(Compl. Ex. 2 at 8.)

The Special Warranty Deed took effect on December 5, 2005 when the PSA was signed. On December 12, 2005, Telegraph signed a Dealer Supply Agreement with Eastern, in which Eastern agreed to supply Telegraph with BP fuel. In February 2006, the defendants became concerned that the prices charged by Eastern were commercially unreasonable. In response to a February 25, 2006 letter from defendants expressing this concern, both Eastern and Telegraph agreed to reduce their profit margins to make the sale of BP fuel at the station property viable. However, this effort was unsuccessful and, in a letter dated August 18, 2006, the defendants requested that Eastern sell them an alternative, more affordable brand of fuel and that it inform BP of its intent to do so. (Opp. To Pl.'s Mot. For Prelim. Inj., Ex. B.) Although the record is not entirely clear,[2] it appears that the defendants

---

[2] This gap in the factual record is not material and does not prevent resolution of the pending summary judgment motions.

continued to purchase BP-branded fuel from Eastern for several months thereafter, but could not sustain the sale of BP fuel at the Property and stopped purchasing BP fuel from Eastern in July 2008. (Def.'s Opp. To Mot. For Summ. J. at 13-14.)

It is uncontested that from July 2008 until July 2009, Telegraph did not sell any gasoline at all from the site, but instead operated solely as a service and inspection station. (Stanley Aff., ¶ 16.) Defendants never informed BP that they were operating a service and inspection station at the property, nor did they request relief from the restrictive covenant to operate Telegraph as a service and inspection station. At oral argument, defendants' counsel represented that because Amoco signage remained on display at the station during this time, Stanley believed the station was BP-branded in conformity with the deed restriction.

On April 27, 2009, Stanley sent BP a letter stating that he could not afford Eastern's prices, that he could not obtain any other supply of BP-branded fuel, that he believed the deed restriction was unenforceable, and that he planned to start selling an alternative fuel brand at the station. (Opp. To Pl.'s Mot. For Prelim. Inj., Ex. C.) When he received no response, he sent a follow up letter on June 10, 2009, to which he again received no response. (Opp. To Pl.'s Mot. For Prelim. Inj., Ex. B.) Defendants began selling an alternative brand of fuel,

AmeriGo fuel, on July 24, 2009.[3]

## II. PROCEDURAL BACKGROUND

BP alleges in its complaint that Telegraph and Stanley violated the PSA and the Special Warranty Deed by selling non-BP branded motor fuel within the fifteen-year period covered by the restrictive covenant (Counts I and II). BP seeks monetary damages, injunctive relief, and its costs and attorney's fees. Defendants have counterclaimed that the deed restriction is overbroad and invalid (Count I) and that plaintiff failed to act in good faith (Count II). They seek dismissal of this action with prejudice, declaratory relief, and their costs and attorney's fees.

## III. DISCUSSION

A. Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1985). In ruling on a motion for summary judgment, a court should accept the evidence of the nonmovant, and all justifiable inferences must be drawn in its favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255

---

[3] BP alleges that it first discovered that the defendants were selling non-BP branded fuel at the station in September 2009. This factual discrepancy is not material to the resolution of the pending summary judgment motions.

5

(1986).

B. The Scope of the Restrictive Covenant

The parties concede that there are no material facts in dispute and that the core legal issue is whether the restrictive covenant is overly broad and therefore unenforceable. Defendants argue that because the covenant covers commercial activities in which BP has no legitimate business interest, such as operating an automotive service station, it is overly broad and the entire restrictive covenant should be struck down as invalid. BP does not dispute defendants' claim that the activities restricted by the covenant are broad; however, it argues that when the agreement was executed, the parties contemplated that the covenant would cover only the sale of fuel at the property and would not apply to the sale or use of other products such as lubricants or the provision of repair or inspection services. Therefore, BP requests that only the restriction on the sale of fuel be enforced.

The restrictive covenant at issue imposes a restraint on the use and alienation of property as well as on trade. It is well-established in Virginia[4] that restraints on the alienation and use

---

[4] The PSA contains a choice of venue clause requiring any dispute arising thereunder to be resolved in a federal or state court in Maryland and a choice of law clause indicating that Maryland law should govern such disputes. However, the parties have not invoked Maryland law or argued that venue in this district is misplaced. As venue can be waived, the parties, by virtue of their failure to object, have consented to venue in

6

of property are disfavored. "Covenants, express or implied, restricting the free use of land are not favored and must be strictly construed." Mid-State Equipment Co., Inc. v. Bell, 217 Va. 133, 140, 225 S.E.2d 877, 884 (1976); see also Providence Square Associates, LLC v. G.D.F. Inc., 211 F.3d 846, 850 (4th Cir. 2000). As such, "'substantial doubts or ambiguity' about the meaning of a restrictive covenant must be resolved in favor of the unrestricted use of land." Providence Square, 211 F.3d at 850 (internal citations omitted). However, a restrictive covenant will be enforced when the party "claiming the benefit of the restrictions [proves] that the covenants are applicable to the acts of which he complains." Id. (citing Sloan v. Johnson, 254 Va. 271, 491 S.E.2d 725, 727 (1997)); see also Double Diamond Properties, LLC v. BP Products North America, Inc., 277 Fed.Appx. 312, 2008 WL 2035617 (4th Cir. 2008).

The covenant also implicates Virginia's legal principles concerning restraints on trade. Restraints on trade are similarly disfavored in Virginia, and are only enforceable if the restraint is "reasonable as between the parties and not injurious to the public by reason of its effect on trade." Merriman v. Cover, 104 Va. 428, 51 S.E. 817, 819 (1905). In addition, "whether or not a restraint is reasonable is to be determined by considering

---

this district. Both parties have applied Virginia law throughout this litigation and therefore have indicated their intent to consent to the application of Virginia law to this civil action.

whether it is such only as to afford a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public." Id.; see also Hercules Powder Co. v. Continental Can Co., 196 Va. 935 (1955)(citing Merriman). In considering the enforceability of restraints on trade, Virginia courts have typically focused on the reasonableness of the restraint, in part because "the law looks with favor upon the making of contracts between competent parties upon valid consideration and for lawful purposes" and therefore "courts are averse to holding contracts unenforceable on the ground of public policy." Lipps v. First American Service Corp., 223 Va. 131, 137 (1982).

Defendants argue that the rigorous standards for construing restrictive covenants in employment non-competition agreements should also be considered. In Virginia, a non-competition agreement between an employer and an employee will be enforced only "if the contract is narrowly drawn to protect the employer's legitimate business interest, is not unduly burdensome on the employee's ability to earn a living, and is not against public policy." Omniplex World Services Corp. v. U.S. Investigations Services, Inc., 270 Va. 246, 618 S.E.2d 340, 342 (2005); see also Grant v. Carotek, Inc., 737 F.2d 410, 412 (4th Cir. 1984)(citing Worrie v. Boze, 191 Va. 916, 62 S.E.2d 876 (Va. 1951)). Although this body of law expresses a general concern about the effect of

non-compete agreements on trade, it is unclear whether the strict standards applied to such contracts, which are often non-negotiable and restrict a person's ability to make a living, would apply to a use restriction on a single plot of land.[5]

There is little law directly on point for the specific type of restrictive covenant at issue in this case. BP relies heavily on <u>Double Diamond</u>, an unpublished opinion in which the Fourth Circuit upheld a restrictive covenant drafted by BP. 277 Fed.Appx. 312. Although the <u>Double Diamond</u> covenant contained some language similar to the Stanley/Telegraph covenant, such as proscribing the sale of "gasoline, diesel fuel, kerosene, benzol, naphtha, greases, lubricating oils..." unless supplied by BP, that covenant was much narrower than the one at issue here, as it applied only to such sales and did not include any prohibition on the operation of a service station on the subject property. Moreover, because the restrictions were so tailored, the <u>Double Diamond</u> covenant was more directly aligned with BP's business interests. Moreover, all of the issues in <u>Double Diamond</u> focused on whether the covenant at issue remained enforceable after BP

---

[5] However, the contract in this case is similar to many employment contracts insofar as the plaintiff appears to have made a non-negotiable offer of sale to the defendant, evidenced by the plaintiff's admission that Eastern had already agreed to purchase the property at the offered sale price, with the restrictive covenant, had defendants chosen to decline the offer. In addition, it appears that Stanley, as an individual station owner, makes his livelihood on the profits from this station.

switched to the jobber model, because BP no longer had a direct benefit from the sale of fuel to Double Diamond. As such, the Double Diamond court neither considered nor decided the issue of whether an overly broad covenant remains enforceable.

Whether the Special Warranty Deed is an enforceable restraint on trade must be evaluated under the Merriman calculus, which requires that the plaintiff, as the party attempting to enforce the restrictive covenant, has the burden of showing that (1) the covenant is reasonable as between the parties and (2) the covenant does not injure the public by its effect on trade. 51 S.E. at 819.

The covenant at issue prohibits using the property for, among other activities, operating an automobile service station and engaging in "the business of selling, offering for sale, storage, handling, distributing or dealing in petroleum... kerosene, benzol, naphtha, greases, lubricating oils" unless the station is BP-branded. (Compl., Ex. 2 at 8.) However, BP has admitted that it does not sell automotive lubricants to the general public, nor does it supply naphtha, benzol, kerosene, greases, or lubricating oils to any service station in Virginia. (Pl.'s Admis. No. 9.; Pl.'s Answer to Interrog. No. 6.) BP also admits that it does not compete in the automotive lubricant industry or receive any revenue from the sale of automotive lubricants anywhere within the Commonwealth of Virginia. (Pl.'s

Admis. Nos. 11-14.) Because the evidence establishes that BP has no interest in the sale or use of these items, the prohibition of their sale, storage, handling, distribution, or dealing on the station property is overly broad, and therefore an unreasonable restraint on the property.[6]

The restriction also states that "[n]o part of the Property shall be used by Grantee or any other Grantee Party, directly or indirectly, for an automobile service station" unless operated as a BP-branded service station. (Compl., Ex. 2 at 8.) BP also admits that it does not offer repair services, or own or operate a repair facility, serving the public in Virginia, and that it does not compete in or receive any revenue from automotive repair services in the Commonwealth of Virginia. (Pl.'s Admis. Nos. 1-4, 6-8.) Moreover, BP has never even supplied the products used in the automotive service operation. (Pl.'s Answer to Interrog. No. 5.) Accordingly, restricting the operation of a service, inspection, or repair station does not fall within the purview of BP's business and therefore these prohibitions on the operation of such station are overly broad and unreasonable as between the parties.

Because the restrictive covenant extends far beyond BP's

---

[6] Indeed, the restrictive covenant is literally so broad that it would prohibit Stanley from operating a restaurant on the property, if it used kerosene to heat the stove, or a bicycle repair shop if petroleum-based lubricants were used.

legitimate business interests, it is unreasonable as between the parties and thus fails the first prong of Merriman. Moreover, because of the covenant's overbreadth, it clearly injures the public because its language chills, and in fact, in this case, entirely halts, the competitive sale of goods to the public. Accordingly, the restrictive covenant also fails Merriman's second prong.

C. Blue-Penciling

BP maintains that overbreadth should not destroy the covenant because the Court should order enforcement of only that part of the covenant in which BP has a legitimate interest, which is the prohibition on fuel sales. BP supports this argument by pointing out that, when the PSA was executed, the parties intended that the prohibition on the sale of non-BP-branded fuel was the only part of the restrictive covenant that would have any force. Citing to Providence Square, BP argues that "'more important is still the purpose of the covenant. Has that purpose been kept or broken?'" 211 F.3d at 851 (citing Krikorian v. Dailey, 171 Va. 16, 197 S.E. 442, 446 (1938)). Essentially, BP contends that when the parties executed the PSA they recognized that the purpose of the restrictive covenant was solely to ensure that no fuel other than BP-branded fuel was sold at the station property. BP cites as evidence of this understanding the

defendants' failure to seek permission from BP to operate a service station on the property, even when they stopped selling BP fuel.[7]

Defendants argue that the Court should view the enforcability of the covenant just as Virginia courts view enforcability of non-compete agreements. In Virginia, when a dispute arises over a non-compete agreement, the agreement is construed as written because "there is no authority for courts to 'blue-pencil' or otherwise rewrite the contract to eliminate any illegal overbreadth." Lanmark Tech., Inc. v. Canales, 454 F.Supp.2d 524, 529 (E.D.Va. 2006)(internal citations omitted); see also Cliff Simmons Roofing, Inc. v. Cash, 49 Va. Cir. 156, 1999 WL 370247 at *2 (Va.Cir.Ct. 1999); Pais v. Automation Products, Inc., 36 Va. Cir. 230, 299 (Va.Cir.Ct. 1995). Virginia courts have also adopted the proscription on blue-penciling in construing other types of contracts with unlawful clauses. See, e.g., Pitchford v. Oakwood Mobile Homes, Inc., 124 F.Supp.2d 958, 966 (W.D.Va. 2000)(striking down an arbitration agreement with an invalid clause, reasoning that to blue pencil the offending part would be "precisely what Virginia courts consistently have

---

[7] Defense counsel rebutted this theory at oral argument, stating that defendants believed that they were in full compliance with the restrictive covenant when they only operated a service station on the property because they did so under the Amoco brand, not because they believed they could disregard the portion of the covenant restricting the operation of a service station.

refused to engage in" and recognizing "the wisdom of the refusal to rewrite the contract between the parties because to do so would be to wreak potential havoc with basic contractual principles, such as mutual assent").

BP offers no Virginia authority to support its argument that the Court should essentially edit the restrictive covenant. In fact, that approach would undermine the reasoning of Merriman and its progeny. The second prong of Merriman requires that a restriction on trade not be injurious to the public. The approach supported by BP would indeed burden the public, which should be able to rely on the accuracy of covenants. Because the covenant at issue is contained in a deed, if Stanley wanted to sell the property, the deed, with its vastly overbroad restriction, would travel with it. Moreover, parties should be encouraged to draft and negotiate covenants that clearly express their purpose and should not expect the judiciary to rewrite covenants, which, after all, is the proper role of the contracting parties.

In sum, the evidence overwhelmingly establishes that the restrictive covenant as written is overbroad and unreasonable as between the parties because it imposes restrictions far beyond the bounds of the plaintiff's legitimate interests and restrains trade and land use to a much greater degree than necessary to achieve BP's purpose. In addition, such overbreadth is injurious to the public insofar as it chills trade and fails to put the

public on notice of the true meaning of a covenant that runs with the land. Lastly, BP provides no support for its argument that the Court should blue pencil the covenant. Accordingly, the Court finds that the restrictive covenant is not enforceable, and that judgment should be entered in favor of the defendants.[8]

### III. Conclusion

For the reasons stated above, plaintiff's Motion for Summary Judgment [34] will be DENIED and defendants' Motion for Summary Judgment [27] will be GRANTED, by an order to issue with this opinion.

Entered this 15th day of July, 2010.

/s/
Leonie M. Brinkema
United States District Judge

Alexandria, Virginia

---

[8] Both parties also requested attorney's fees and costs, in accordance with paragraph 43 of the PSA, which allows the prevailing party to recover reasonable attorney's fees and court costs from the non-prevailing party in any dispute arising under the PSA. As the parties agree that the amount of such costs and attorney's fees should be resolved in a separate fee petition, the Court's Order will include a schedule for briefing on that issue.